1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   SUSAN DELGADO,                            CASE NO. 1:11-cv-01622-LJO-SMS

10                        Plaintiff,

11        v.                                  FINDINGS AND RECOMMENDATIONS
                                              RECOMMENDING THAT THE COURT
12   MICHAEL J. ASTRUE,                       AFFIRM DENIAL OF BENEFITS AND
     Commissioner of Social Security,         ORDER JUDGMENT FOR COMMISSIONER

13
                          Defendant.
14
     _____/
15

16        Plaintiff Susan Delgado, by her attorney, Sengthiene Bosavanh, seeks judicial review of a

17   final decision of the Commissioner of Social Security ("Commissioner") denying her application

18   for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C.

19   § 301 *et seq.*). The matter is currently before the Court on the parties' cross-briefs, which were

20   submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate

21   Judge. Following a review of the complete record and applicable law, the undersigned

22   recommends that the Court affirm the Commissioner's denial of benefits.

23   I.   **Administrative Record**

24        A.   **Procedural History**

25        Plaintiff has filed numerous prior applications for SSI, and has taken four of them to

26   hearing. The first application resulted in an unfavorable decision in 1995. Plaintiff was

27   subsequently granted benefits, which were later terminated by another ALJ in 2004. Plaintiff's

28   third application, filed in 2005, resulted in an unfavorable decision in 2007. The ALJ in that case

1

found that Plaintiff had the "severe" impairments of arthritis, degenerative disc disease, and obesity, but found that these impairments were not disabling.

On July 10, 2007, Plaintiff filed the present application. She alleged disability beginning January 1, 2007. Her claim was denied initially on September 25, 2007, and upon reconsideration on February 7, 2008. Plaintiff filed a written request for a hearing on March 27, 2008. The hearing was held on July 20, 2009. Plaintiff appeared and testified. She was represented by attorney Gina Fazio. During and after the hearing, Plaintiff submitted additional evidence which became part of the record.

**B.    Factual Record**

**1.    Plaintiff's Testimony**

At the time of the hearing, in July 2009, Plaintiff was 48 years old. She had a tenth grade education, without any additional GED or vocational training. She had performed no past relevant work within the previous 15 years. She stood 5'2" tall and weighed 234 pounds.

She stated that she experienced pain in her back, shoulders, thighs, knees, wrists, and fingers. AR 25-28. She had a burning sensation in her left knee, which began five years prior to the hearing. The pain in her shoulders made reaching overhead and in front problematic; her shoulders went numb and burned. Her fingers swelled; she could use buttons, but not pick up small items, hold items longer than 30 seconds, or even brush her teeth. Her hands would go numb driving more than 20 minutes. She had been told that she had carpal tunnel syndrome and fibromyalgia. Pain medication helped, but faded over time and caused side effects of fatigue and nausea. She slept three hours a day. She did not identify a symptom that caused this sleep pattern.

Due to pain in her lower back, she could sit for 30 minutes, stand for 30 minutes, and walk two blocks. She could lift a half gallon of milk. Eighteen months earlier, Plaintiff had told an ALJ that she could lift a full gallon of milk; Plaintiff acknowledged that this represented a change. AR 31, 46.

She lived by herself in an apartment. She drove to visit her parents and to medical appointments. When driving, she had difficulty holding the steering wheel, and her back bothered her. Her activities included watching TV, reading the Bible, and visiting with her parents about

once a month. She did not go to church, the movies, or visit with friends. Her daughter helped her with laundry and other household chores. However, Plaintiff washed dishes, cooked a little, and vacuumed without assistance. Her daughter assisted her with grocery shopping, but Plaintiff could do light grocery shopping without assistance.

Plaintiff was on medication for depression, but other than that she was not getting mental health treatment. Her depression had good days and bad days. She had five bad days a week. On a bad day, she would not want to do anything, and would spend the day sleeping, walking around the apartment, or praying.

### 2.   Disability and Functional Reports

In July 2007 and again in October 2007, both Plaintiff and her daughter completed functional reports describing Plaintiff's abilities.

In July 2007, Plaintiff described various activities that she performed routinely. She would make tea, lightly make her bed, brush her teeth, take a shower, make simple meals, vacuum the carpet, wash dishes, watch television, and mop the floor. She would to go outside up to two or three times a week, usually for medical appointments. To get around she would drive or be driven.

She also described activities that she no longer performed due to her conditions. She no longer would shop in stores, walk ten blocks, or go skating. She could no longer shop or go to the movies with her daughter for more than an hour, nor could she rent movies, as she could not sit still for the full movie. Due to changes to her social habits, she would no longer bake for her parents or visit them frequently; instead she would see them briefly once a week. Her back pain would keep her awake at night.

In describing her functional abilities, she stated that her conditions affected her ability to lift (she could not lift more than a gallon of milk), walk (after a half-hour, her back would burn and she would need to sit), climb stairs (she felt a burning feeling in her knees), squat (impossible due to back pain), sit, bend (impossible due to back pain), kneel (she felt a burning feeling in her knees), use her hands, stand (after a half-hour, her back would burn and she would need to sit), and reach. Her conditions did not affect her ability to talk, hear, see, recall, complete tasks,

///

3

concentrate, understand, follow instructions, or get along with others. She could hold attention for 25 to 35 minutes, did not finish what she started, and did not handle stress well.

Plaintiff's October 2007 report was virtually identical, except that she now indicated that she could only walk "one block" before needing to sit. (In her July 2007 report, she indicated that she could walk for thirty minutes.) She also noted that Dr. Bird had diagnosed her with fibromyalgia in August 2007.

On the same days as Plaintiff completed these two reports, her daughter, Brigetta Delgado, completed third-party functional reports. Plaintiff's daughter noted that she and Plaintiff only spent one day a week together, such that she "really [did not] know" what Plaintiff did during a typical day because she was "not there." AR 115, 144. Both her reports closely correspond to Plaintiff's reports, with only a few noticeable differences: She noted that, before the onset of her illnesses, Plaintiff was more cheerful and energetic. Also, in describing Plaintiff's limitations, she checked the box for "getting along with others" and wrote next to the box, "sometimes." She added: "when her back hurts she turns the phone off."

### 3.   Testimony of Vocational Expert

Thomas Dachelet testified as the vocational expert. The ALJ assumed that Plaintiff had no past relevant work. AR 37.

The ALJ assumed a person of the same age, education, and work background as Plaintiff, who could do light physical exertion. For the first hypothetical, the ALJ added that this person could only occasionally handle and finger. For the second hypothetical, this person instead needed unscheduled work breaks totaling an hour or more per workday. The vocational expert testified that, as to both hypotheticals, the person would be disabled.

### 4.   Medical Record

#### i.   Physical Impairments

Plaintiff stated that her back pain started in 1977, after she had surgery for a pilonidal cyst. AR 195.

On March 23, 2007, Plaintiff completed an intake form to begin physical therapy at Community Outpatient Rehabilitation Center. AR 171. She complained of neck and lower back

4

1   pain. She also mentioned depression, anxiety, panic attacks, carpal tunnel syndrome, and arthritis.

2   On April 17, 2007, at her third physical therapy session, Plaintiff discharged herself from the

3   program, stating that she "doesn't see any improvement." AR 167. Her physical therapist noted

4   that Plaintiff demonstrated poor compliance with her treatment regime and home exercise

5   program. Plaintiff was resistant to instructions, suggestions, or possible contributory causes for

6   her pain.

7       On August 26, 2007, Plaintiff met with consultative examiner Steven Stoltz, M.D. AR

8   195-99. Dr. Stoltz noted that she appeared healthy, though obese, and in no distress. Dr. Stoltz

9   diagnosed back pain, arthralgia (joint pain), an unspecified psychiatric diagnosis, obesity, and

10  hyperlipidemia. Based on his examination he concluded that Plaintiff had no medical impairments

11  to work-related activities. He did not make any judgment on psychiatric issues; later that day,

12  Plaintiff would meet with consultative examiner Ekram Michael, M.D., for a psychiatric

13  examination. (See below.)

14      On August 27, 2007, Plaintiff received treatment from Garret Bird, M.D. AR 276-277.

15  Plaintiff stated she had back pain for twenty years and also had knee pain. Dr. Bird diagnosed

16  fibromyalgia based on the presence of tender points, prescribed the pain medication Gabapentin,

17  and instructed Plaintiff to taper off Vicodin.

18      On September 10, 2007, non-examining state agency medical consultant Roger Fast, M.D.,

19  completed a Physical Residual Functional Capacity ("RFC") Assessment and contributed to a case

20  analysis. AR 234-39, 271-72. He reviewed the medical evidence, including Plaintiff's poor

21  compliance with her physical therapy treatment regime and the findings of consultative examiner

22  Dr. Stoltz. He concluded that Plaintiff could perform a full range of light work.

23      In November 2007, Dr. Bird saw Plaintiff again. AR 299. She was complaining of diffuse

24  pain. Gabapentin had not helped. Dr. Bird again diagnosed fibromyalgia and prescribed Lyrica for

25  her pain.

26      In January 2008, state agency non-examining medical consultant Ernest E. Wong, M.D.,

27  performed a case analysis. AR 281-82. He affirmed Dr. Fast's opinion that Plaintiff was capable

28  of performing a full range of light work.

1     In February 2008, Dr. Bird concluded that Lyrica had failed. Plaintiff reported that it made

2 her nauseated and dizzy and prevented her from driving. She had excessive daytime sleepiness.

3 She reported that her back pain would wake her up. AR 297.

4     In March 2008, Plaintiff told Dr. Bird that she was taking Vicodin daily. AR 295-96.

5 However, Plaintiff's urine toxicology reported negative for Vicodin. Plaintiff insisted that she

6 never missed a dose. When Dr. Bird and Dr. Kerr confronted Plaintiff, she made an excuse,

7 stating that she was "doing a system cleanout," which the two doctors found implausible. In

8 addition, Plaintiff acknowledged that she was not taking Vicodin as prescribed, but was getting it

9 from an outside source. She stated that this source was her sister, who is a nurse, but did not

10 provide any information that would allow the doctors to identify her sister. Dr. Bird concluded

11 that he could no longer prescribe Vicodin for Plaintiff, but he did increase her dosage of Zoloft.

12     In May 2008, Dr. Bird reiterated that he had discontinued Plaintiff's Vicodin because she

13 was a "possible redistributor" who was getting Vicodin "other places." AR 293-94. Plaintiff

14 reported that after the increase in Zoloft, she had increased anxiety. Dr. Bird discontinued the

15 Zoloft. As a treatment for both the fibromyalgia and the anxiety, Dr. Bird prescribed Lexapro.

16     A November 2008 progress report reflects that Plaintiff left the doctor's office, stating that

17 she had "to go to work." AR 323.

18     In January 2009, x-rays were done of Plaintiff's thoracic spine and lumbar spine. Her

19 thoracic spine reflected accentuated dorsal kyphosis (curvature of the upper spine), mild to

20 moderate marginal spurring on the vertebral bodies, some spurring on the costovertebral joints

21 (joints connecting the ribs with the vertebrae), but normal disc spacing and facet joints. AR 318.

22 Her lumbar spine showed moderate scoliosis (side-to-side curvature of the spine) and

23 hyperlordosis (exaggerated curvature of the lumbar spine), but normal disc spacing, only slight

24 marginal spurring in the vertebral bodies, and normal facet and sacroiliac joints. AR 317.

25                          **ii.    Mental Impairments**

26     On August 26, 2007, Plaintiff met with consultative examiner Ekram Michael, M.D., for a

27 psychiatric examination. AR 201-04. Plaintiff complained of depression and anxiety all her life.

28 She experienced sudden panic attacks. The depression caused her to get angry easily and to sleep,

                                          6

1   eat, and cry a lot. She had been on Zoloft for the past ten years. This was prescribed by her

2   primary care physician. She had no history of psychiatric hospitalization or mental health follow-

3   up. Dr. Michael noted that her mood was depressed, but her recall was intact, and her thought

4   process was directed and goal-oriented. He diagnosed Plaintiff with depressive disorder NOS (not

5   otherwise specified) and anxiety disorder (NOS). He found that plaintiff was unable to carry out

6   an extensive variety of technical or complex instructions, but she could maintain attention and

7   concentration to carry out simple job instructions. She could relate and interact with coworkers,

8   supervisors and the general public.

9          On September 12, 2007, non-examining state agency medical consultant P. Polizos, M.D.,

10   performed a review of Plaintiff's alleged mental impairments. His review followed the procedures

11   at 20 C.F.R. § 416.920a for evaluating mental impairments. First, he completed a psychiatric

12   review technique form. AR 252-58. He stated that plaintiff had depression and anxiety, and that

13   these imposed moderate restrictions on social functioning but only mild limitations with respect to

14   activities of daily living and to maintaining concentration, persistence, or pace. He concluded that

15   Plaintiff's overall psychiatric impairment was severe but not of listing level, and that it would be

16   necessary to perform an RFC assessment. Dr. Polizos identified Dr. Michael as the source of some

17   of his evidence.

18          On the same date, Dr. Polizos also completed a mental RFC assessment form. AR 240-43.

19   On the first two pages of this form are checkboxes for "summary conclusions," while the third

20   page contains a narrative section for a "detailed explanation of the degree of limitation for each

21   category." Using the checkboxes, Dr. Polizos indicated that Plaintiff had a moderate limitation in

22   her "ability to understand and remember detailed instructions" and a marked limitation in

23   her"ability to carry out detailed instructions;" in narrative he stated that Plaintiff was "able to

24   perform simple routine tasks." Using a checkbox, he indicated a moderate limitation in her

25   "ability to complete a normal workday and workweek without interruptions from psychologically

26   based symptoms and to perform at a consistent pace without an unreasonable number and length

27   of rest periods;" in narrative he stated that Plaintiff "is able to maintain and sustain

28   attent/concent/pace/persistence." Using a checkbox, he indicated a moderate limitation in her

1  "ability to respond appropriately to changes in the work setting," and elaborated in narrative that

2  Plaintiff "is able to respond relate and ad[a]pt at work adequately." Finally, Dr. Polizos used a

3  checkmark to indicate a moderate limitation in Plaintiff's "ability to interact appropriately with

4  the general public." He did not elaborate upon this in the narrative.

5          As described above, Plaintiff received her psychiatric medication from her primary care

6  physician, Dr. Bird. On August 27, 2007, in addition performing a physical assessment, Dr. Bird

7  noted that Zoloft mostly controlled Plaintiff's anxiety. He referred her to a mental health clinic.

8  AR 276-277. In March 2008, Dr. Bird raised Plaintiff's Zoloft from 50mg to 100mg daily as a

9  treatment for her fibromyalgia; he noted that he could not prescribe Vicodin because she was

10 receiving it from other sources. In May 2008, Plaintiff reported that after the increase in Zoloft,

11 she had increased anxiety. Dr. Bird discontinued the Zoloft, and prescribed Lexapro as a treatment

12 for both the fibromyalgia and the anxiety.

13         On September 24, 2007, non-examining state agency medical consultant Archimedes

14 Garcia, M.D., completed a psychiatric review technique form. He concluded that Plaintiff's

15 anxiety and depression were not severe and imposed no work-related limitations. Dr. Garcia also

16 completed a case analysis. He reviewed Dr. Michael's objective findings, including Plaintiff's

17 complaint that she had been depressed and anxious her whole life, and found Plaintiff not

18 credible. He noted the lack of supporting evidence in the record. Plaintiff had not sought formal

19 psychiatric treatment despite her allegations of disabling psychiatric symptoms, and was receiving

20 her Zoloft prescription from her primary care provider. A third party report noted no psychiatric

21 difficulties other than dealing with stress.

22         In January 2008, non-examining state agency medical consultant P. Davis, Psy.D.,

23 performed a case analysis. AR 283. He affirmed Dr. Garcia's opinion that Plaintiff had no severe

24 mental impairment.

25 **II.      The ALJ's Decision**

26         The ALJ noted that Plaintiff had filed several prior applications, the most recent of which

27 was rejected by an ALJ on February 6, 2007. Under *Chavez v. Bowen*, 844 F.2d 691 (9th Cir.

28 1988), that ALJ's finding of nondisability was res judicata for her claims before that date. In

addition, his finding created a rebuttal presumption of nondisability after that date. Plaintiff could rebut that presumption, but only by showing a "changed circumstance" affecting the issue of disability after that date.

The ALJ found that Plaintiff had shown changed circumstances because she alleged a new impairment, depression, on or after February 6, 2007. He therefore proceeded to consider whether Plaintiff was disabled after that date.

The ALJ followed the five-step sequential process prescribed by the Commissioner for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). This process entailed answering the following five questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 10, 2007, the application date.

Second, the ALJ identified Plaintiff's severe impairments: arthritis, degenerative disc disease, and obesity. (416.920(c)). He did not identify any mental impairments.

Third, the ALJ determined that Plaintiff's impairments did not meet or medically equal one of the listed impairments.

Before proceeding to step four, the ALJ determined Plaintiff's RFC: she could lift and carry 20 pounds occasionally and 10 pounds frequently, and she could sit, or stand and walk, six hours in an eight-hour workday.

1    At step four, the ALJ determined that Plaintiff had no past relevant work.

2    At step five, the ALJ determined that Plaintiff's case could be resolved under the Medical-

3  Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. Based on his earlier findings,

4  she had a RFC for the full range of light work with no restrictions; her age made her a "younger

5  individual age 18-49;" her education was limited, with the ability to communicate in English; and

6  she had no transferability of job skills because she had no past relevant work. Thus, the ALJ

7  applied Medical-Vocational Rule 202.17, which entailed a finding of "not disabled."

8  **III.**   **Discussion**

9       **A.**   **Scope of Review**

10       Congress has provided a limited scope of judicial review of the Commissioner's decision

11  to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a

12  court must determine whether substantial evidence supports the Commissioner's decision. 42

13  U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

14  402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d

15  1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept

16  as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be

17  considered, weighing both the evidence that supports and the evidence that detracts from the

18  Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the

19  evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g.,*

20  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's

21  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

22  the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and*

23  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

24       **B.**   **Legal Standards**

25       To qualify for benefits, a claimant must establish that he or she is unable to engage in

26  substantial gainful activity because of a medically determinable physical or mental impairment

27  which has lasted or can be expected to last for a continuous period of not less than twelve months.

28  42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of

1  such severity that he or she is not only unable to do his or her previous work, but cannot,

2  considering age, education, and work experience, engage in any other substantial gainful work

3  existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

4  **C.    Plaintiff's Claims**

5      The Court reads the brief as stating three claims: that the ALJ overlooked non-exertional

6  limitations in Plaintiff's RFC[1] because he failed to consider the expert opinion of state agency

7  medical examiner Dr. P. Polizos, M.D.; that the ALJ wrongly rejected the functional report of

8  Plaintiff's daughter; and that the ALJ failed to consider all the evidence of Plaintiff's functional

9  limitations.[2]

10      **1.    Failure To Consider Expert Opinion Was Harmless Error**

11      State agency medical and psychological consultants are highly qualified specialists who

12  are also experts in Social Security disability evaluation. 20 C.F.R. § 416.927(e)(2)(i). An ALJ

13  must consider their findings as opinion evidence. *Id.*; SSR 96–6p. The ALJ must explain the

14  weight that he gives to their opinions, unless he relies entirely on a treating source's opinion. *Id.*

15      The ALJ never mentioned Dr. Polizos. It is not even clear that he considered his opinion.

16  The Commissioner concedes that the ALJ erred, but argues that the error was harmless. Plaintiff

17  argues that the error was not harmless. Had the ALJ considered Dr. Polizos's opinion, he might

18  have credited Plaintiff as having one or more non-exertional limitations.

19      "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability

20  determination.'" *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citing *Carmickle*, 533

21  F.3d at 1162. Speaking of a failure to properly discuss lay testimony, the Ninth Circuit explained

22  that the error could be considered harmless only if the reviewing court "can confidently conclude

23  that no reasonable ALJ, when fully crediting the testimony, could have reached a different

24

25      [1] The complaint actually states that this was an error at Step Five, in that by failing to identify
26  Plaintiff's non-exertional limitations, the ALJ wrongly applied the Medical-Vocational Guidelines at
27  Step Five. But the error is best described as occurring at the RFC calculation.

28      [2] Other issues in the brief were addressed too tangentially and are deemed waived. *See Carmickle
    v. Comm'r of Soc. Sec. Admin.,* 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

1  disability determination." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (citing

2  *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir.2006)).

3      Plaintiff argues that had the ALJ credited Dr. Polizos's opinions, he might have credited

4  Plaintiff as having one or more non-exertional limitations. The Court disagrees. The psychiatric

5  review technique form could not have affected the ALJ's finding, as it did not reflect Dr. Polizos's

6  estimates of Plaintiff's limitation, but were part of his Step Two and Step Three determination.

7  SSR 96-8p. The Mental RFC form would also not have affected Plaintiff's RFC calculation.

8  Although Dr. Polizos checked boxes which describe limitations when taken by themselves, he

9  also provided what the form itself called a "detailed explanation of the degree of narrative for

10  each category" in the narrative section, and did not identify significant limitations:

11          Based on the evidence in the file the Clmnt is able to maintain and sustain
           attent/concent/pace/persistence, is able to respond relate and ad[a]pt at work adequately,
12          able to perform simple routine tasks.

13  The only limitation here is being "able to perform simple routine tasks." This limitation is

14  consistent with the ALJ's relying upon the Guidelines, as the Guidelines already account for this

15  limitation as "unskilled work." *See* 20 C.F.R. § 416.968 (a) (defining unskilled work as "work

16  which needs little or no judgment to do simple duties that can be learned on the job in a short

17  period of time").

18                    **2.    Rejection Of Daughter's Functional Report Was Not Error**

19      Referring to the functional reports submitted by Plaintiff, the ALJ gave "some" evidentiary

20  weight to her descriptions of her activities of daily living. He gave "little weight" to her

21  statements as to her "affected" areas because these statements were not supported by the overall

22  medical record. Referring to the functional reports submitted by Plaintiff's daughter, the ALJ

23  reached the same conclusions for the same reasons.

24      Generally, when an ALJ discounts lay witness testimony of a claimant's subjective

25  symptoms, the ALJ must give reasons that are germane to each witness. *Valentine v.*

26  *Commissioner Social Security Administration*, 574 F.3d 685, 694 (9th Cir. 2009). However, the

27  ALJ need not do so if the witness and Plaintiff give similar testimony and the ALJ provides

28  ///

adequate reasons for rejecting Plaintiff's testimony. *Id.* Plaintiff argues that her daughter's functional report was not sufficiently similar to hers for this rule to apply.

In fact, the reports were almost identical. Plaintiff's daughter does put a check next to one additional limitation—"getting along with others." But she then dilutes this statement, writing next to the box "sometimes" and explaining that"when her back hurts she turns the phone off."

In any event, the ALJ did provide a reason that was germane to Plaintiff's daughter. He rejected her report because her statement were not supported by the overall medical record.

### 3.      The ALJ Did Not Fail To Consider Evidence Of Plaintiff's Limitations

Plaintiff mentions a mélange of things that the ALJ failed to consider. When she mentions arguments too briefly, the Court deems them waived. *See Carmickle,* 533 F.3d at 1161 n.2. The Court considers the following pieces of unconsidered evidence: whether her obesity, in combination with her other weigh-bearing impairments, was medically equivalent to a listing; whether her obesity formed objective support for Plaintiff's subjective claims of pain, fatigue, sleep difficulty, and reduced social functioning; and whether her obesity was a non-exertional limitation, by itself or when considered with Plaintiff's complaints.

**Obesity at Step Three.** The ALJ properly considered the role of Plaintiff's obesity at Step Three. Plaintiff characterizes the ALJ as "merely stat[ing] that no medical evidence showed the obesity imposed any limitations." The ALJ did not say this. He said that there is no indication that the obesity "has any effect on her impairments." AR 13. In making this statement he was doing exactly what he was required to do under SSR 02-1p: pursuant to that ruling, he explained that he considered obesity "when deciding if [Plaintiff] has medically-determinable impairments that are severe, whether those impairments meet or equal any listing; and finally in determining the residual functional capacity, since obesity may have an adverse impact upon co-existing impairments." In finding that Plaintiff was not disabled at Step Three, the ALJ also noted that no treating or examining medical source had specifically attributed additional or cumulative limitations to Ms. Delgado's obesity.

**Obesity as objective support for Plaintiff's subjective complaints**. To evaluate subjective symptoms, an ALJ must first find an underlying medically-determinable impairment

13

that could reasonably be expected to produce those symptoms. The ALJ then must evaluate whether the impairment can account for the extent of the symptoms in the claimant's case. 20 C.F.R. § 416.929.

Plaintiff claims that the ALJ erred in not identifying obesity as an impairment that could support her symptoms. But the ALJ's finding at the first step was favorable to Plaintiff. He found that her "medically determinable impairments can reasonably be expected to produce her alleged symptoms.

It was at the second step where he made a finding adverse to Plaintiff, in that he did not credit Plaintiff's subjective symptoms. However, this finding was supported by substantial evidence. He noted that Plaintiff had very little medical treatment for her physical complaints and not any mental health treatment, leading him to conclude that her physical and mental symptoms were not as disabling as she claimed. Furthermore, he stated that her subjective complaints were not supported by the minimal objective findings on physical examinations and diagnostic studies. He also cited various additional factors that caused him to question her credibility, such as evidence that she was working when she claimed she was not.

**Obesity as a non-exertional limitation, by itself or when considered with Plaintiff's other complaints**. The Court cannot adjudicate this because it misuses terminology. Obesity is a medically determinable impairment, not a limitation. 20 C.F.R. § 416.908 (defining impairment). A limitation is the effect that an impairment has on the ability to perform work-related activities. *See* 20 C.F.R. § 416.921. As discussed above, the ALJ properly considered the limitations caused by Plaintiff's obesity as well as those caused by her arthritis, degenerative disc disease, and other symptoms.

IV.   <u>Conclusion</u>

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

*///*

14

1        These Findings and Recommendations will be submitted to the Honorable Lawrence J.

2   O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1). On or

3   before March 22, 2013, any party may file written objections with the Court. The document

4   should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff

5   is advised that, by failing to file objections within the specified time, she may waive the right to

6   appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

7

8   IT IS SO ORDERED.

9   **Dated:    February 27, 2013**                    _____/s/ Sandra M. Snyder_____
                                        UNITED STATES MAGISTRATE JUDGE